ELIZABETH A. WOLFORD, United States District Judge
INTRODUCTION
Buffalo Laborers Welfare Fund, Buffalo Laborers Pension Fund, Buffalo Laborers Education and Training Fund, Buffalo Laborers Security Fund, Thomas L. Panek, Laborers Employers Cooperation and Education Trust, and Laborers' Local 210, Laborers International Union of North America (collectively, "Plaintiffs") brought this action on August 19, 2016, pursuant to Sections 502(a)(2), 502(a)(3), and 515 of the Employee Retirement Income Security Act ("ERISA"), as amended, *593 29 U.S.C. §§ 1132(a)(3) and 1145, and Section 301 of the Labor Management Relations Act of 1947 (the "LMRA"), 29 U.S.C. § 185. (Dkt. 1). Plaintiffs allege that Di Pizio Construction Company, Inc. ("Defendant") breached its collective bargaining obligations and violated ERISA. (Id. ). Plaintiffs allege that Defendant is liable for unpaid benefit contributions. (Id. ). Presently before the Court is Plaintiffs' motion for summary judgment. (Dkt. 15). For the reasons set forth below, the motion for summary judgment is granted.
BACKGROUND
I. Factual Background
Plaintiffs Buffalo Laborers Welfare Fund, Buffalo Laborers Pension Fund, Buffalo Laborers Education and Training Fund, and Buffalo Laborers Security Fund (the "Funds") are jointly-administered, multi-employer, labor-management trust funds established and maintained pursuant to various collective bargaining agreements ("CBA") and trust agreements in accordance with Sections 302(c)(5) and (c)(6) of the LMRA. (Pl. Stmt. ¶ 1; Def. Stmt. ¶ 1 (insufficient information to admit or deny) ).[1] The Funds are employee benefit plans and multi-employer plans under ERISA. (Pl. Stmt. ¶ 1; Def. Stmt. ¶ 1 (insufficient information to admit or deny) ). The Funds' purpose is to provide fringe benefits to eligible employees on whose behalf employers contribute to the Funds pursuant to CBAs between employers and Plaintiff Laborers' Local 210, Laborers International Union of North America (the "Union"). (Pl. Stmt. ¶ 1; Def. Stmt. ¶ 1 (insufficient information to admit or deny) ). Plaintiff Thomas L. Panek is the Administrator of the Funds and is a fiduciary under ERISA. (Pl. Stmt. ¶ 2; Def. Stmt. ¶ 2 (insufficient information to admit or deny) ). The Laborers Employers Cooperation and Education Trust (the "LECET") is a jointly-administered, multi-employer, labor-management trust fund established and maintained pursuant to various CBAs in accordance with the LMRA. (Pl. Stmt. ¶ 2; Def. Stmt. ¶ 2 (insufficient information to admit or deny) ). The Funds are authorized to collect contributions to the LECET. (Pl. Stmt. ¶ 2; Def. Stmt. ¶ 2 (insufficient information to admit or deny) ).
Defendant is a for-profit corporation doing business in the State of New York that performs construction work in and around Erie County. (Pl. Stmt. ¶¶ 5-6; Def. Stmt. ¶¶ 5-6). Defendant entered into a series of CBAs through its bargaining representative, the Labor Relations Division of the Western New York Region, Associated General Contractors of America ("AGC"). (Pl. Stmt. ¶¶ 9-12; Def. Stmt. ¶¶ 9-12 (stating AGC was authorized to negotiate terms of potential agreement; disputes the dates that Plaintiffs state Defendant was bound by a CBA) ). Pursuant to those agreements, Defendant paid contributions to the Funds on behalf of its employees for health coverage, deferred compensation, and other benefits. (Pl. Stmt. ¶ 19; Def. Stmt. ¶ 19 (insufficient information to admit or deny) ).
The crux of the dispute in this case is whether Defendant was bound by a CBA during the period in question-August 31, 2014, through April 30, 2016-and whether Defendant failed to pay $95,224 in fringe benefit contributions owed to the funds as a result of work performed during that time period that was covered by that agreement. According to Plaintiffs, Defendant was bound by the 2014-2017 Highway Heavy, Utility and Tunnel Agreement *594 (hereinafter, the "Agreement") entered into on or about April 1, 2014, with a term of April 1, 2014, through March 31, 2017. (Pl. Stmt. ¶ 12). Defendant denies that allegation and states that the last CBA it entered into was for the 2008 to 2013 time period. (Def. Stmt. ¶ 12).[2] The parties also dispute whether AGC was authorized to enter into the Agreement on behalf of Defendant. Plaintiffs contend that Defendant authorized AGC to act as its bargaining representative and agreed to be bound by any agreement reached on its behalf by AGC. (Pl. Stmt. ¶ 10 (citing AGC Auth. (Dkt. 16-11) ). Defendant denies that statement and clarifies that it only authorized AGC to negotiate the terms of a potential agreement. (Def. Stmt. ¶ 10). Defendant states that it signed all previous collective bargaining agreements on its own behalf. (Id. at ¶ 9).
On February 24, 2014, Plaintiffs filed an action against Defendant captioned Buffalo Laborers Welfare Fund, et al. v. Di Pizio Construction Company, Inc. , 14-CV-135 (the "Prior Action") seeking unpaid contributions. (Pl. Stmt. ¶ 21; Def. Stmt. ¶ 21). The parties settled the dispute, requiring Defendant to pay a portion of the statutory damages in addition to the full principal owed. (Pl. Stmt. ¶¶ 22-23; Def. Stmt. ¶¶ 22-23).
After settling the Prior Action, the Funds audited Defendant for the period from August 31, 2014, through April 30, 2016 (the "Audit"). (Pl. Stmt. ¶ 25; Def. Stmt. ¶ 25 (insufficient information to admit or deny) ). The Audit revealed that Defendant had failed to pay $95.224 in fringe benefit contributions owed to the Funds, $3,306.36 in dues checkoffs owed to the Union and $408.50 in contributions to the LECET. (Pl. Stmt. ¶ 84; Def. Stmt. ¶ 84 (insufficient information to admit or deny) ).
The Funds provide all employers with partially completed remittance forms for employers to use to report their hours of covered work, but rather than using that standard form, Defendant submitted reports using its own unique form. (Pl. Stmt. ¶ 35; Def. Stmt. ¶ 35 (stating that the reports were sent for information only) ). Defendant submitted remittance forms reporting covered work performed between September 2014 and April 2016. (Pl. Stmt. ¶ 40; Def. Stmt. ¶ 40). Of the 33 remittance forms submitted for that time period, 18 were not accompanied by payments. (Pl. Stmt. ¶ 42; Def. Stmt. ¶ 42 (Defendant denies, citing Dkt. 26-5 (Di Pizio Aff. at ¶ 10 (not directly responsive) ) ) ). According to Plaintiffs, a remittance report submitted without payment is an acknowledgement of debt owed by the employer. (Pl. Stmt. ¶ 43; Dkt. 17 (Panek Decl. ¶¶ 16-17) ). In response, Defendant refers to the affidavit of Heather Grimaldi ("Grimaldi"), Defendant's controller, who states that her submissions did not certify or agree to the terms and conditions of the remittance reports. (Def. Stmt. ¶ 43 (citing Dkt. 26-1 (Grimaldi Aff. ¶¶ 9-10) ) ). According to Plaintiffs, the deficiency discovered by the Audit is nearly identical to the amount Defendant submitted as due on the remittance *595 forms received without payment. (Pl. Stmt. ¶ 45; Def Stmt. ¶ 45 (denying) ).
II. Procedural Background
Plaintiffs filed their complaint in this Court on August 19, 2016. (Dkt. 1). On February 6, 2017, Plaintiffs served Defendants with requests for admissions. (Pl. Stmt. ¶ 71; Def. Stmt. ¶ 71). The requests instructed that "[e]ach matter is admitted unless, within 30 days after service ... [Defendant] serves a written answer or objection for each separate matter." (Dkt. 16-3 at 2). Defendant did not respond within the 30-day time period. (Pl. Stmt. ¶ 73; Def Stmt. ¶ 73 (denying and citing to Def. MOL (Dkt. 26 at 4 ("responses were served long before depositions were taken") ) ) ). Defendant served its responses to Plaintiffs' requests on June 9, 2017. (Pl. Stmt. ¶ 73; Def. Stmt. ¶ 73 (denying and citing to Def. MOL); Dkt. 16-7 (Ex. G) ).
Plaintiffs filed the instant motion for summary judgment on September 13, 2017. (Dkt. 15). Defendant submitted papers in opposition to the motion on October 18, 2017 (Dkt. 26), and Plaintiffs replied in support on November 1, 2017 (Dkt. 27). Oral argument in this case was scheduled to take place on June 14, 2018; however, Defendant did not appear to defend the motion. After being contacted by the Court via telephone at the time of the scheduled oral argument, defense counsel informed the Court that Defendant "had instructed [him] not to come in and was willing to accept the default." (Dkt. 32 at 3). The Court confirmed with defense counsel that Defendant "is no longer opposing the motion." (Id. at 4).
DISCUSSION
I. Standard of Review
Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. Scott v. Harris , 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese , 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. , 475 U.S. at 586-87, 106 S.Ct. 1348 ). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
Rule 56 also provides that if a non-moving party fails to properly oppose a summary judgment motion, the court may "grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(3). However, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." Vermont Teddy Bear Co. v. 1-800 Beargram Co. , 373 F.3d 241, 244 (2d Cir. 2004). The court may not grant the motion without first determining that the moving party has met its burden of demonstrating that no material issue of fact remains for trial. See id. Here, although Defendant represented, by telephone at the June 14, 2018, appearance, that it *596 would not oppose the motion, the Court nonetheless has reviewed the evidence to determine whether summary judgment is appropriate.
II. Defendant's Arbitration Argument
The Court turns, first, to Defendant's arbitration argument. In its papers, Defendant argued that the dispute about whether the Agreement applies is subject to arbitration, and this Court therefore lacks jurisdiction. (Dkt. 26 at 9). Defendant asserted in its answer that "the contract provides for arbitration." (Dkt. 6 at ¶ 38). However, Defendant did not attempt to further assert an arbitration defense until its response to the motion for summary judgment.
The arbitration clause provides that, with the exception of "claims, disputes, and demands arising out of the Employer's wage, fringe benefit contribution, and audit obligations," and "disputes arising out of jurisdictional disputes":
[A]ll complaints, disputes or grievances arising between the parties hereto involving questions of interpretation or application of any clause of this Agreement, or any acts, conduct, or relations between the parties or their respective members or employees, directly or indirectly, shall be resolved in accordance with the procedure set forth in the balance of this Article.
(Dkt. 18-1 (Agreement) at 22).
Plaintiffs argue, first, that the arbitration clause does not bind them because they are not parties to the Agreement. (Dkt. 27 at 10). The arbitration provision applies to "disputes between parties hereto ... or to their respective members or employers." (Dkt. 18-1 (Agreement at Article XIX Section (b) ) ). Plaintiffs are not named as parties to the Agreement.
In Upstate New York Engineers Health Fund by Harrigan v. DiPizio Constr. Co. , No. 514CV1539MADTWD, 2017 WL 3016834 (N.D.N.Y. July 14, 2017), reconsideration denied , No. 514CV1539MADTWD, 2017 WL 5713213 (N.D.N.Y. Nov. 28, 2017). another case involving Defendant. Di Pizio advanced the same arbitration argument. Id. at *5. As is the case here, the agreement in that case contained a clause providing for arbitration of disputes between employers and the union. Id. The court rejected Di Pizio's argument that the dispute should be arbitrated because, "[i]n similar cases, courts in this circuit have found 'the plain language of these provisions to limit the mandatory arbitration requirement to the parties explicitly referenced in the agreement: the Employer and the Union.' " Id. at *6 (quoting Dodge Hyundai of Paramus v. United Welfare Fund, Welfare Div. , No. 11-CV-979, 2011 WL 4356373, at *4 (E.D.N.Y. Sept. 16, 2011) ). The Court concludes that, for the same reason, the arbitration clause in the Agreement does not require arbitration of the claims in this case.[3]
III. Requests for Admissions
Turning to the merits of the dispute, as an initial matter, Plaintiffs argue that because Defendant failed to timely respond to Plaintiffs' requests for admissions, the facts in the requests are deemed admitted. (Dkt. 15-2 at 15). Under *597 Federal Rule of Civil Procedure 36, a "party may serve on another party a written request to admit ... the truth of any matters within the scope of Rule 26(b)(1)...." Fed. R. Civ. P. 36(a)(1). "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter...." Fed. R. Civ. P. 36(a)(3). "A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). Admissions made under Rule 36, "even default admissions, can serve as the factual predicate for summary judgment and may be withdrawn or amended only by a motion made under Rule 36(b)." Atl. Sea Pride, Inc. v. McCarthy , No. 1:13-CV-0670 LEK, 2013 WL 5652492, at *2 (N.D.N.Y. Oct. 15, 2013) (internal quotation marks omitted). The Second Circuit has held that "the court has the power to make exceptions to the Rule only when (1) the presentation of the merits will be aided and (2) no prejudice to the party obtaining the admission will result." Donovan v. Carls Drug Co. , 703 F.2d 650, 651-52 (2d Cir. 1983).
Defendant has not argued that it submitted its objections to the requests for admissions within the 30-day time period, or that it moved the court to withdraw or amend its admissions. (See Dkt. 26 at 4). Rather, Defendant stated that it responded to Plaintiffs' discovery demands "as soon as it became apparent that a settlement was not achievable," and "long before depositions were taken and long before Plaintiffs[ ] made this motion for summary judgment." (Id. ).
Defendant did not comply with Rule 36. Plaintiffs served their requests on February 6, 2017. (Pl. Stmt. ¶¶ 71-74; Dkt. 16-3 (Ex. C) ). Defendant served its response on June 9, 2017. (Pl. Stmt. ¶ 75; Dkt. 16-7 (Ex. G) ). Defendant did not move the Court to permit its late response or to amend its admissions. Thus, the facts in Plaintiffs' requests are deemed admitted pursuant to Fed. R. Civ. P. 36(a)(3).
Plaintiffs also argue that Defendant's response, in addition to being late, is defective. (Dkt. 15-2 at 15). Fed. R. Civ. P. 36(a) provides:
A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify an answer or deny only part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder.
Defendant denies 34 of 38 requests without qualification. (Dkt. 16-7). Defendant denies, for example, that it was bound by the Agreement; the written terms of the Agreement; and denies receiving a copy of the Audit and Plaintiffs' demand letter, which it produced during discovery (Dkt. 16-9 (Ex. I) ). (Dkt. 16-3 (Ex. C ¶¶ 9, 14); Dkt. 16-7 (Ex. G ¶¶ 9, 14) ). Defendant failed to qualify its responses in circumstances in which the record clearly demonstrates that qualification was appropriate. Thus, in addition to being deemed admitted as a result of untimeliness, Defendant's admissions do not comply with Rule 36.
Plaintiffs contend that the requests for admissions alone provide an ample basis for summary judgment based on the following admissions: "[Defendant] is bound by the Agreement"; "pursuant to the Agreement, [Defendant] is obligated to remit fringe benefit contributions to the Funds for employees performing Covered Work beginning April 1, 2014 through March 31, 2017"; "the Audit correctly found a deficiency of $95,224.00 with respect to fringe benefit contributions"; "the Audit correctly found a deficiency of $408.50 with respect to LECET contributions"; and "the Audit correctly found that *598 [Defendant] failed to deduct and/or remit $3,306.36 in dues checkoffs." (Dkt. 16-3 (Ex. C, Requests 2, 4, 11, 12, 13) ). The Court agrees that those admissions provide a sufficient basis for summary judgment. Even so, the Court will discuss the reasons why summary judgment is appropriate in this case excluding the admissions.
IV. Defendant Breached Its Contractual Obligations under the Agreement
A. The Agreement
Plaintiffs argue that Defendant breached its contractual obligations under the Agreement by failing to make payments for all covered work. (Dkt. 15-2 at 18). Plaintiffs contend that between February 2005 and September 2016, Defendant authorized AGC to negotiate and enter into CBAs with the Union. (Dkt. 27 at 7-8). Defendant argued, in its opposition to the motion for summary judgment, that AGC was not authorized to sign CBAs on its behalf. (Dkt. 28 (Glovinsky Decl. at ¶ 3) ). However, the evidence in the record indicates that AGC was authorized to enter into CBAs on Defendant's behalf, and that it entered into the Agreement at issue in this case.
The authorization provides that "[Defendant] agrees to be bound to any collective bargaining agreement, extension of agreement or other contract reached on its behalf by ... AGC, with the [Union], This authorization shall continue in full force and effect until revoked by [Defendant] in a fashion consistent with law." (Dkt. 16-11 (Authorization) ). During her July 2017 deposition, Roseanne Di Pizio ("Di Pizio"), Defendant's consultant and representative, recognized that the authorization "was faxed by [Defendant] in February 2005 to [AGC] designating [Defendant's] rights...." (Dkt. 28-1 (Di Pizio Dep. at 16-17) ). At the deposition, Di Pizio was presented with a letter to AGC dated September 14, 2016, indicating Defendant's withdrawal from the authorization. (Id. at 19). Di Pizio testified that she submitted that letter after being advised by AGC that it lacked any prior record of Defendant's withdrawal. (Id. 19-20). Di Pizio testified that she was unaware of any prior termination of the authorization. (Id. at 22). Thus, the undisputed evidence in the record indicates that Defendant was bound by the authorization between 2005 and September 2016.
Defendant's argument that AGC was only authorized to negotiate, but not to enter into, agreements on its behalf is unsupported in the record. The authorization plainly states that Defendant "agrees to be bound to any collective bargaining agreement ... reached on its behalf by ... AGC." (Dkt. 16-11 (Authorization) ). Di Pizio states in her affidavit that "all other CBAs prior [to the Agreement], that were also negotiated by [AGC], were all executed by Bernard Di Pizio, President of [Defendant]." (Dkt. 26-5 (Di Pizio Aff. at ¶ 13) ). However, at her deposition, Di Pizio testified that she did not know whether Defendant had signed a contract directly with the Union since 2005 and stated that she was not aware "if anyone would know." (Dkt. 28-1 (Di Pizio Dep. at 25) ). Defendant has submitted no evidence, beyond Di Pizio's conclusory statements in her affidavit, to suggest that AGC was not authorized to enter into agreements on Defendant's behalf. Defendant has produced no previous agreements signed by Bernard Di Pizio.
Defendant also argued, in its opposition papers, that because it is an 8(f) employer under the National Labor Relations Act ("NLRA"), it was under no duty to enter into the Agreement after the previous CBA expired. (See Dkt. 26 at 5). According to Defendant, it did not affirmatively *599 execute the Agreement. (Id. ). Defendant is correct that "employers who have an 8(f) relationship with a union do not have an obligation to bargain for a successor contract." James Luterbach Const. Co. , 315 N.L.R.B. 976, 979 (1994) (citing John Deklewa & Sons , 282 N.L.R.B. 1375, 1377-78 (1987) ). To determine whether an 8(f) employer is bound by a subsequent multiemployer agreement, courts ask, first, "whether the employer was part of the multiemployer unit prior to the dispute giving rise to the case," and second, "whether that employer has, by a distinct affirmative action, recommitted to the union that it will be bound by the upcoming or current multiemployer negotiations." Id. at 980.
However, the National Labor Relations Board ("NLRB") has also clarified that "there can be cases where the employer has expressly given continuing consent to bargain a successor contract on a multiemployer basis." Id. at 981 n. 11. In Kephart Plumbing , 285 NLRB 612 (1987), the NLRB concluded that the 8(f) employer had authorized an association to negotiate with the union on its behalf, and that the authorization continued unless the employer took some action to withdraw the group's bargaining authority. Id. at 612. Thus, although the employer had no obligation to bargain for a successor contract, it had done so through the association. The same is true here. As explained above, Defendant authorized AGC to negotiate and enter into CBAs on its behalf.
On April 1, 2014, AGC was Defendant's bargaining agent. (See Dkt. 16-11 (Authorization); Dkt. 28-1 (Di Pizio Dep. at 16-17) ). AGC entered into the Agreement with the Union as "negotiating agent for those members who have designated [AGC] as their bargaining agent with respect to Local 210." (Dkt. 18-1 (Ex. A (Agreement) ) at 4). Thus, the uncontroverted evidence in the record demonstrates that Defendant was bound by the terms of the Agreement.[4]
B. Breach of Obligations under ERISA
Pursuant to section 515 of ERISA,
[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with the law, make such contributions in accordance with the terms and conditions of such plan or such agreement.
29 U.S.C. § 1145. ERISA also mandates certain record-keeping requirements: "[E]very employer shall ... maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees." 29 U.S.C. § 1059(a)(1).
Although the Second Circuit has not addressed the standard that applies when a benefit fund contests the amount of contributions owed by an employer, other circuits, as well as district courts in this Circuit, have held that where the fund produces evidence "raising genuine questions concerning an employer's failure to maintain adequate records," the burden then shifts to the employer to present "evidence either of the precise number of hours worked or to negate the reasonableness of the inferences to be drawn from the plaintiff fund's evidence."
*600 Fuchs v. Tara Gen. Contracting, Inc. , No. CV 06-1282 (ETB), 2009 WL 2922840, at *7 (E.D.N.Y. Sept. 8, 2009) (citing Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc. , 30 F.3d 692, 696-97 (6th Cir. 1994) ). "If the employer fails to produce such evidence, the court may award damages to the trustee[s] even where the damages are an approximate amount." Id.
Plaintiffs contend that Defendant's unpaid remittance reports and failure to maintain records are probative of its liability and create a presumption in Plaintiffs' favor. (Dkt. 152 at 20-21). Defendant admits that it did not keep records for the jobs for which it failed to make fringe benefit contributions. (Pl. Stmt. ¶ 68; Def. Stmt. ¶ 68 (stating records for "small jobs" are not required) ).
Defendant has not submitted any evidence to rebut the presumption in Plaintiffs' favor other than its assertion that the Agreement, by its terms, does not cover the type of work at issue here. According to Defendant, the Agreement is entitled "Highway-Heavy, Utility and Tunnel Agreement," and the work at issue is not highway work, is not heavy work (was not performed with large pieces of equipment), and did not involve utilities or tunnels. (Id. ). That argument fails based on the language of the Agreement. During her deposition, Di Pizio testified that whether work is covered by the Agreement depends on the cost and size of the project. (Dkt. 16-15 (Di Pizio Dep. at 32) ). However, nothing in the Agreement excludes projects based on size or budget. (See Dkt. 18-1 (Ex. A (Agreement) ); Dkt. 18 (Capitano Decl. ¶ 11) ). Di Pizio also testified that, in her opinion, a day-long project to repair a curb in a church parking lot is not covered work. (Dkt. 16-15 (Di Pizio Dep. at 32) ). However, the Agreement explicitly covers the construction of curbs. (Dkt. 18-1 (Ex. A (Agreement) at Article II, section 1) ). Di Pizio testified that a specific construction project-Gabe's Collision-included work that was not covered by the Agreement. (Dkt. 16-15 (Di Pizio Dep. at 34) ). However, the record shows that that project included parking areas, foundations, and excavation, all of which are covered by the terms of the Agreement. (Dkt. 18 (Capitano Decl. ¶ 8); Dkt. 18-1 (Ex. A (Agreement) at Article II, section 1) ).
Defendant also argues that Grimaldi sent "some of" the remittance reports without authorization, had no knowledge of the work covered by the Agreement, and had not read the Agreement when she submitted those reports. (Dkt. 26 at 11). That argument is unpersuasive. As explained, the evidence shows that the work at issue here was covered by the Agreement, and that Defendant was bound by the terms of the Agreement. Thus, what Grimaldi knew or did not know when she submitted the remittance reports is of no consequence to the Court's determination.
Next, Plaintiffs contend that the Audit itself creates a presumption that Defendant did not make the required contributions. Indeed, district courts in this Circuit have relied on an audit or auditor's opinion to prove a defendant's failure to make contributions. Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of Int'l Union of Operating Engineers, Local 15, 15A, 15C & 15D, AFL-CIO v. Eastport Excavation & Utilities Inc. , 3 F.Supp.3d 204, 214 (S.D.N.Y. 2014) ; see Trustees of the Plumbers Local Union 1 Welfare Fund v. Philip Gen. Constr. , 2007 WL 3124612, at *10 (S.D.N.Y. Oct. 23, 2007) ("If adequately explained and credited by the Court, the opinion of an auditor is a sufficient basis for an award of a specific amount of damages."). Plaintiffs have submitted audit reports compiled by the accounting firm Lumsden & McCormick, LLP (Dkt. 19-1), as well as the declaration of Johnathan Roller, Audit *601 Principal at the firm explaining the steps taken to conduct the audit (Dkt. 19) and the firm's report regarding application of the agreed-upon procedures (Dkt. 19-1). Plaintiffs argue that here, as in Eastport Excavation , the Audit describes its methodology and the procedures used. and is also verified by the consistency between the Audit and the remittance reports. (Dkt. 15-2 at 19). The Court agrees and concludes that the Audit and supporting documentation is sufficient to create a presumption that Defendant failed to make required contributions.
In response. Defendant argues that the Audit is not evidence of unpaid contributions because it does not describe the work or projects completed, but rather only describes the individuals and hours worked. (Dkt. 26 at 10). Defendant argues that if the Court concludes that the Agreement was in effect, it should conclude that it did not cover the work at issue here. (Id. at 7). For the reasons explained above, the Court rejects that argument.
Finally, Plaintiffs argue that Defendant's deduction of dues from the Union laborers' wages is evidence that its employees performed covered work. (Dkt. 15-2 at 20). The Agreement authorizes an employer to deduct and remit dues from the wages of all authorized employees performing covered work. (Pl. Stmt. ¶ 20; Def. Stmt. ¶ 20; Dkt. 18 (Capitano Decl. ¶ 17) ). The evidence establishes that Defendant deducted dues from the wages of Union laborers at the rate required by the Agreement. (Dkt. 20 (Heist Decl. 16); Dkt. 21 (Weitz Decl. ¶ 7); Dkt. 22 (Parks Decl. ¶ 7); Dkt. 16 (Gorlick Decl. ¶ 18); Dkt. 16-13 (Ex. M (Di Pizio Payroll Journals) ); Dkt. 16-14 (Grimaldi Dep. at 39-42) ). The dues checkoff obligation applies only to employees working within the jurisdiction of the Agreement. (Dkt. 18 (Capitano Decl. ¶ 17) ). Samuel Capitano, Business Manager of the Union, states in his declaration that the deduction of dues at the Union rate is a "representation by the employer that the work performed is Covered Work." (Id. ¶ 18). Defendant does not offer an explanation for the uncontroverted evidence that it deducted dues from employees' wages, despite the fact that Defendant simultaneously argues that the work at issue was not covered work.
In sum, the Court concludes that there is no issue of material fact regarding Defendant's breach of its contractual obligations under the Agreement and ERISA. Thus, Plaintiffs' motion for summary judgment is granted.
CONCLUSION
For the foregoing reasons, Plaintiffs' motion for summary judgment (Dkt. 15) is granted. The Clerk of Court is directed to enter judgment in favor of Plaintiffs.
SO ORDERED.

"Pl. Stmt." refers to Plaintiffs' Rule 56 Statement of Undisputed Material Facts. (Dkt. 15-1). "Def. Stmt." refers to Defendant's reply to Plaintiffs' Rule 56 statement. (Dkt. 26-8).

Defendant focuses much of its argument that it was not bound by the Agreement on the fact that Erie Canal Harbor Development Corp. ("ECHDC") terminated its contract with Defendant on May 8, 2013. (Dkt. 26 at 3). After the termination of that contract, Defendant's surety stopped bonding Defendant, with the result that Defendant was no longer able to bid on contracts for the type of work covered by the Agreement. (Id. ). Litigation between Defendant and ECHDC ensued regarding the termination of the contract. (Id. ). Although the evidence in the record establishes that the contract was terminated, Defendant has failed to meaningfully connect that fact with the relevant inquiry in this case-whether Defendant was bound by and breached its contractual obligations under the Agreement.

Plaintiffs also argue that arbitration is not required because (1) their claims fall squarely within the exclusion for claims "arising out of the Employer's wage, fringe benefit contribution, and audit obligations" (Dkt. 27 at 11; Dkt. 18-1 (Agreement at XIX Section(a) ) ); and (2) Defendant waived its arbitration claim by failing to advance its arbitration argument for more than a year after commencement of the litigation. (Dkt. 27 at 11). Because the Court concludes that the arbitration clause does not bind Plaintiffs, the Court need not address those arguments.

Plaintiffs also argue that, even if Defendant was not bound by the Agreement, Defendant is estopped from making that argument because Defendant, through its conduct, led the Union laborers to believe that they were working under the terms of the Agreement and earning benefits. (Dkt. 15-2 at 26). Because the Court concludes that Defendant was bound by the Agreement, it need not address Plaintiffs' estoppel argument.